The next case today is Legal Sea Foods, LLC v. Strathmore Insurance Company, Appeal Number 21-1202. Attorney Levine, please introduce yourself for the record and proceed with your argument. Good morning. May it please the court, Michael Levine on behalf of Appellant Legal Sea Foods. Chief Judge Howard, may I please reserve five minutes for rebuttal? You want five minutes? Yes, Your Honor. All right. I'm going to hold you to your opening time, though, but granted. Three points I'd like to address and then answer questions the court may have. All of these arise in the context of an all-risk insurance policy that Strathmore sold to Legal Sea Foods with knowledge of the COVID-19 pandemic and without a virus exclusion that Strathmore had available to it and understood that if it had used it, it could have barred coverage for direct physical loss or damage caused by a virus. The three points are these. The district court failed to accept legal's allegations and draw inferences in its favor. For example, the district court said loss was caused by orders when legal had alleged that it was caused by COVID-19 and SARS-CoV-2, the causative virus, that was present in its restaurants and Strathmore, in fact, had even admitted as much in its coverage denial. The district court disregarded allegations of it alleged that its air had been physically altered by the presence of the virus. It alleged that its surfaces had been physically changed by the presence of the virus. The second point is that the district court made factual determinations on a motion to dismiss, and it made several. It found that the virus is not enduring. It found that the virus could not affect the integrity, the structural integrity of legal's property, and in doing so, read into the policy or requirement that damage somehow be structural. The district court found that the virus is merely transient, again, reading into the policy or requirement that is not there that direct physical loss be lasting or permanent. The district court also found that virus is incapable of damaging property, and lastly, found that the virus can simply be cleaned using disinfectants. The third point is that the district court fundamentally misapprehended and, therefore, misapplied controlling Massachusetts law interpreting the phrase direct physical loss or damage, including this court's decision in the Bloom South case. Now, it ignored... Mr. Levine, let me ask you a question. In count two of your complaint, you alleged that the governor ordered restaurant restrictions and, therefore, illegal seafood closed. Is that correct? Count two of the complaint concerns the civil authority coverage, which is... Facts alleged in count two were that the governor ordered restaurant restrictions and, therefore, illegal seafoods closed. Well, legal seafoods alleged that it closed as a result of three things. The presence of SARS-CoV-2, the orders, which obviously were issued... They were open until the governor issued his order, correct? Well, they were closing at around the same time as the governor issued the order. I believe, in fact, the company had decided to close before the orders took effect. The day before the governor issued his order, the restaurant was open, was it not? I believe it was. Okay. Now, was there damage? Was there physical loss of damage at that time, or did the physical loss of damage occur as soon as the governor issued the order and the restaurant closed? No, the physical loss or damage, Your Honor, occurred as soon as the virus was introduced to the property. Now, learning about the virus and what the virus did to the property... The virus was introduced long before the governor ordered the restaurant to close, but the restaurant continued to be open in spite of that physical loss of damage. Why was there suspension afterwards, but not before? Because the restaurant didn't understand what the virus was doing to its property, to its air, to its surfaces, and how it was affecting its patrons. This is an iterative learning process and something, Your Honor, quite unique to anything that we've ever experienced, and that we're learning about this virus real-time. It's not like any other type of insured loss where we know what it is, we appreciate it when it happens, and we can say we have to take certain actions. This is something that we are learning. I mean, what has the restaurant done to restore the property during the period of its closedown? The policy only pays during the period of restoration. Are you saying that all of the furniture is going to be burned because it can't be restored? No, Your Honor, not at all. So, what is the restoration process the restaurant has had in effect from the day they closed? So, the restoration process is multifaceted, to say the least. It involves physical alteration of the property. It involves new air filtration systems. It involves physical distancing within the premises by spreading tables, removing tables by adding physical barriers within the premises. It involves not ordinary cleaning, as Judge Gorton suggested, but deep disinfection when virus is detected. And when virus is detected is an ongoing process because every time somebody with the virus introduces into the premises, they reintroduce the virus into the premises. This is an ongoing process. How does this relate to the pending SJC case? Where are we on that? What is the potential difference between this case and that case, etc.? Judge Barron, I think I understood the question you were breaking up a little bit. So, the Vervine case is before the SJC. The SJC has exercised its own power to take that case for review, demonstrating the importance of it and the significance to the SJC. That case is similar but not exactly the same as this case because Vervine was based solely on the order. So, to Judge Singal's question, that case was about the orders and nothing but the orders. They don't allege that the virus was present. They don't result in alteration of the property, the surfaces or the air. Are they bringing only a civil authority claim or not? Well, civil authority is one coverage. They are alleging, I understand in Vervine, physical loss or damage, which is the property damage trigger and time element coverage. That's identical to the claim you're making. Correct. The coverages they're seeking are the same but the factual basis, the cause of loss, is fundamentally different. Again, they allege the cause of loss was the orders. If the SJC were to rule in favor of the insured on the risk of loss coverage claim, that would, given what you're saying about what they've alleged, it would be hard for that not to be helpful to you here, correct? Correct. If they rule in favor of Vervine, it would be helpful to legal here. If they rule against Vervine, that would not necessarily dispose of this case. You think it's not dispositive because you hear different allegations. That's exactly correct. But it is possible that what the SJC did, if it was favorable to the insured there, it would be dispositive of your risk of loss claim, at least as you see it. That's correct because Vervine is a broader allegation. And just on that point, in your briefing, you framed up questions for certification to the SJC. I guess one possibility is we can just decide the case here. Another possibility is we can wait to certification. What is the value of certifying a question given the nature of the question that's at the SJC right now? What would you want a certified question that would ensure that something was being addressed that otherwise might not be by the SJC? The value in certifying the case to the SJC is that the SJC would have before it a broader Does it require only the orders or something more? Does it require alleged tangible alteration of air and surfaces as legal has alleged? However, and again to the earlier point, certification is essential because as this court did in Bloom South, as Chief Judge Howard determined, direct physical loss or damage has been addressed in Massachusetts. Let me just make sure I have one point that I didn't get confused by what you just said. As I understand it, the SJC's pending case on risk of loss is dependent solely on the orders, correct? That's correct. And you have additional allegations here, you say, that make your case on risk of loss not dependent solely on the orders, correct? That's correct. Paragraphs 127, 28, 29, etc. Are you also making the argument that is before the SJC that you can get risk of loss coverage based on the orders or are you not making that argument? We are not making that argument, Your Honor, because we have more. Then, now I'm a little bit confused. How could the SJC decision help you? Because at most, it will decide a risk of loss question based on orders, which you're not making. Sure. If I can conceptualize this, direct physical loss is best viewed as a spectrum. On the one hand, you have total obliteration of the property. On the other end of the spectrum, you have what could be a deprivation, a loss of use, without anything affecting the property physically. The Vervine case is very close to that latter end of the spectrum. Loss of use is a result of orders, but nothing physically touched the property, according to the allegations. Legal seafood is more toward the middle because legal seafood alleges that something affected the property, that the virus was present, that it altered the air, that it altered the surfaces. It doesn't get all the way to total obliteration. That would be absurd to even allege. That's not what happened. What did happen was that something, an external source... I understand that. I'm trying to just figure out a simple point, which is how would the Vervine holding potentially help you? It would help us... I had thought it would because all you were adding was additional factual allegations. If, in fact, you're just not a Venn diagram, but you just don't overlap, your contention is that it was because of the physical presence of the virus. That's why you have risk of loss. They're arguing it was because of the orders. That's why they have risk of loss. Ruling on the orders causing it might not tell us anything about what the SJC would think about whether the presence of the virus can be a ground for the risk of loss. It would, Your Honor. Here's how. Because, again, on the spectrum of physical loss, you have nothing on the one end and total devastation on the other, the Vervine case would necessarily include legal sequence. If the SJC were to say that Vervine has alleged a claim of direct physical loss or damage simply by way of the orders, which again didn't physically affect the property, didn't touch the property, then that would necessarily include some greater allegation, the actual presence of the virus. Why? Because it might not because they may reject the idea that the virus itself can be present in the way you would need it to be to cause a physical loss, even though an order could. Well, in that case, then perhaps the SJC should have this case as well so that it could again, the full spectrum of effects from the COVID-19 pandemic. Now, and I'll point out to Your Honor, because this may help clarify, in paragraph four of the second amended complaint, legal alleged, again, this is the three causes, the orders, the presence and the pandemic all contributed to the suspension of operations and the resulting loss of business income and extra expense. Now you're saying that orders is played as one of the causes of the risk loss claim or not? It is. It is played. There's no doubt in his signal. Well, it's played as a cause of loss and that cause of loss would apply to either civil authority coverage or time element coverage. But you didn't appeal the judge's dismissal of count two, which is your civil authority, correct? That's correct. Because to show, to prove civil authority coverage, you necessarily have to prove the same thing, plus that it occurred to somebody else's property, plus the reason that the orders were issued. Well, that's now out of the case. The judge's ruling on that is final in a sense, correct? That's correct. And we are not pursuing that coverage. Let me put it really simply. The exact question that's before the SJC and Revine, which is that the orders triggered the risk of loss coverage. Is that an argument that you pled that you preserved on appeal to us? We did. And that would be through paragraph four, among other paragraphs of the second amended complaint. And you're pleading that in the alternative to the argument that independent of the orders, it also is triggered. That's exactly correct. Mr. Levine, I thought you just told me that the governmental order was count two, which you did not appeal. Count two is the civil authority coverage, which is predicated on the orders as the cause of loss. And the judge's decision below was specifically not appealed by legal seafoods to this court, correct? On count two, that's correct. Are you using the orders for more than one count? Yes. The orders are pled as a cause of loss for the direct physical loss or damage, which is count one and resulting time element and business interruption. It is possible. And again, this issue is before through Revine before the SJC that the SJC can say the orders alone are sufficient to constitute direct physical loss or damage, like more specifically direct physical loss. But legal has pled more. Remind me, the district court with respect to what you're saying now is the role that you pled, the orders play not in the civil authority count, but in the direct physical law count. What was the district court's reason for rejecting the claim that you say is identical to the claim now before Revine, which is that the orders caused the direct physical loss? Well, in a general sense, what the district court said was that legal had not pled a tangible alteration, a structural alteration to the property. I believe the district court lumped all of the alleged causes into one and said nothing that legal has alleged. Talks about a structural alteration of the property. Why didn't you appeal count two? Again, because the civil authority coverage, it's not a coverage that legal can obtain in addition to the business interruption, extra expense coverage. It would be one or the other. And the civil authority coverage not only that the virus damaged property or that the orders damaged property, but that legal also must show that that damage occurred to somebody else's property and that the orders that precluded access to legal's property were the direct result of that damage. And then you also have the access issue, which is a separate issue that doesn't arise under the time element and business interruption coverages. So to put it in a nutshell, the civil authority coverage is much more difficult to establish. So Mr. Levine, you are out of time. So at this time, I'm going to ask if the judges would like you to make any additional points, argue any Thank you, Your Honor. All right. If you would mute, then we will hear from Mr. Varga. Good morning, Your Honors. May it please the court. Gregory Varga for Strathmore Insurance Company. Your Honors, there are two issues on appeal, two issues that have to be addressed here. And one of them, Mr. Levine did not address. And that is the suspension of operations. And let me clarify. With this coverage, both business income and extra expense, the insured must plausibly allege facts to support both that its business was necessarily suspended and that that suspension was caused by direct physical loss of or direct physical damage to property. That causal nexus is absolutely essential. It's as essential as the element of direct physical loss and direct physical damage. The policy only provides for business income loss when it is sustained during because of a suspension of operations during what's known as the period of restoration. In this case, legal seafoods does not allege a causal nexus between the alleged presence of virus in any restaurant and either the closure of a restaurant or some slowdown of any part of its operations. And that's an absolutely critical issue here because it's dispositive. That was one of the grounds upon which the district court granted the motion to dismiss. It found that the factual allegations of the complaint did not plausibly allege a causal nexus. I'm sorry, Your Honor. Can you hear me? I can now, yes. I want you to get into the substance of it, but I want to make sure I understand something. The way you just framed it and the failure of the allegations as you describe them with respect to this point, is that equally true in your understanding of the claim that's before the SJC in the Revine case? It is not, Your Honor. In the Revine case, the issue that's presented is whether the governor's orders issued in response to the direct physical damage to the insured restaurant properties. Now, with respect to that precise point, as I just understood your opponent, he was representing, unless I misunderstood it, that that is also pled in this complaint here. Your Honor, it was originally pled in the complaints. It is alleged, but they have abandoned and I would direct the court to page 42 of their opening brief, page 42 of the appellant's opening brief, where they distinguish what they call orders only cases from around the country from this case. They say those cases are not pertinent here because they do not, at this point on appeal, they do not claim that that's a basis. I'm sorry, Your Honor. I guess the tricky thing is whether since they want to portray this as an orders plus case, the question is, are they exclusively bringing it as an orders plus case or are they leading it as an orders case and also an orders plus case and also just a plus case beside the orders? I mean, I think it matters to some extent because that will inform whether the SJC's decision has any bearing on this case because I think you're describing it as they're describing the SJC case as an orders only case. Is that right? The Vervian case is an orders only case, Your Honor, which is to say that they do not allege the presence of virus in their restaurants. But I guess what I'm understanding your opponent's saying is we're not worse off for also alleging the presence of the virus. We never said that the orders alone couldn't do it. We're just saying and also the virus is present and that could have been a cause. What's your answer to that? Well, I think that they are two different issues and there are, you know, the SJC in addressing the Vervian case is going to be focusing solely on the question of do government orders affect or cause some form of damage. I'm just trying to figure out what your understanding and what you would like our understanding to be of what your opponent has claimed here in this case. They have said to us that it's true they have not brought an orders only case only, but they were just saying at oral argument, as you heard, that they also claim to be having before us an orders only case, not on the civil authority claim, but on the risk of loss claim. What is your answer to that? My answer to that, your honor, is, as I mentioned, page 42 of their opening brief, they have abandoned the issue of the orders causing any form of physical damage. If I didn't agree with you on that, maybe I will agree with you, but if I didn't agree with you that they waived it in their opening brief, that sounds to me like you're not disputing them that the complaint itself, the operative complaint, could be read to be bringing an orders only claim. I would dispute that, your honor. The operative complaint is definitely not an orders only complaint or an orders only case, whereas Verveen is definitely an orders only case. So, in this case, Legal Seafoods initially brought this case in 2020, in its first two iterations of its complaint, as an orders case. It said the orders caused a, not a suspension, the orders caused physical damage and physical loss to our property. It wasn't until they sought leave to amend in September of 2020, when they then were given leave to add an allegation that virus is physically present at their restaurants, and they allege that that's a cause of some form of loss or damage, and they abandoned the orders as the cause of physical loss and physical damage. So, Verveen is distinct in that sense. Where in the complaint is the abandonment? I understand what your argument is about how they abandoned it in the appeal, but why would I read the complaint when it adds in those additional allegations to have abandoned the orders only risk of loss argument? Well, your honor, the complaint, if the court examines their allegations about the COVID-19 pandemic, which begin at page 45, excuse me, paragraph 45 at joint appendix 266, and continue through paragraph 68 at joint appendix 270, the focus of their claim of direct physical loss of, or direct presence of virus, which clearly, and obviously we dispute, but that's the basis for their case here. They have walked away from any allegation that the government orders caused physical loss or physical damage to their property. One last question I'll let you get back to. Yes, your honor. Maybe I misread your brief. I thought a big part of your brief was that they hadn't alleged presence of the virus. Is that wrong? Your honor, we concede they allege that virus is present in four restaurants, and then they allege that it's statistically certain that it's present in others. That we can't dispute. It's alleged in the complaint. What we dispute is that the presence of virus constitutes direct physical loss of property or direct physical damage to property such that it would trigger coverage under the policy's business income or extra expense provisions. That's the distinction, but they allege the virus is there. And you're saying that's the only causal basis they've alleged? Your honor, I didn't hear the full question. I'm sorry. You're saying that your position is that that is the only causal basis for the risk of loss that they've alleged is the presence of the virus in that way you just described? Correct, and that's why they say their case is distinguishable from others in which plaintiff's policyholders are arguing that orders caused physical damage, orders caused physical loss. They draw that clear distinction at page 42 of their opening brief. And we pointed out in page 50 of our respondent's brief that they had walked away from that as a basis for this case, and they didn't even respond to it in their reply. They just let that go. So, and earlier in his argument, Mr. Levine conceded that to this court, I should point out. So, your honor, if I may, just returning to the point of suspension of operations because I think this is critically important as well. Again, they, in order to get past the motion to dismiss, they needed to allege facts to plausibly establish not just the presence of or the existence of at the restaurants, but also that that alleged loss or alleged damage caused a necessary suspension of their operations. If the court examines the complaint, you will find an alternative explanation for why their business operations allegedly were suspended. And I would direct the court very specifically to paragraphs 77 and 78 of the complaint. If the court reviews those allegations, you will see that there are five specific ways in which Legal Seafood says that its business operations were interrupted or suspended by government orders, not by the presence of virus in their restaurants, but by government orders. And I'll read them for the court because I think they're important. Briefly, they say, although each order, and this is at 77, although each order has its own impact, generally speaking, the orders have affected Legal Seafood's operations in the following ways. Mandating the closure of Legal Seafood's restaurant locations. B, prohibiting access to Legal Seafood's restaurant locations either in whole or in part. C, restricting guest vendor and employee access to Legal Seafood's locations. D, limiting guest capacity where access is not prohibited. And E, requiring the installation of physical and structural alterations to their property, including protective barriers. And the next paragraph, following those specific factual allegations, says this, the orders caused the suspension of Legal Seafood's operations. The suspension is ongoing as some orders have been extended and others introduced. Why did I go to the effort of reading all that? There are no comparable allegations of fact in this complaint that tie the alleged presence of virus in any restaurant to any interruption or suspension of their business operations. And that is an independently dispositive ground upon which to affirm the district court's decision. Can you help me with one thing? So I've been thinking about if there's a fire that is so significant that it would operate to cause a suspension, but there's a fire marshal's order that gets issued before the restaurant has made any decisions, would you be arguing the same thing? Either that that's an intervening cause or it doesn't relate back or that they can't even get to discovery in a case like this where counsel said to us today that they were making the decision to shut down, independent of the governor's order? First of all, your honor, that statement that they were making the decision to shut down appears nowhere in the complaint. And we are evaluating, of course, the allegations of the complaint. That is not, you cannot find that statement in there. But, but let me, they make an assertion. Now this may just be in the briefing, not the complaint. Perhaps you could clarify this for me. They make an assertion that the presence of the virus has made at least some of their restaurants uninhabitable. They do allege that, your honor. And I would direct the court to paragraph 62 and 79 through 80 of the complaint. And I will say that that conclusory allegation that the presence of virus makes restaurants uninhabitable is contradicted by the factual allegations in paragraphs 62, 79 and 80. And if I may explain why, paragraph 62 tells us that when the governor lifted the restrictions on indoor dining at restaurants, legal seafoods resumed operating their restaurants, despite the fact that it is quote statistically certain that additional infected individuals have been and with the regained access to indoor spaces continue to be present at each of legal seafoods insured locations. What does that mean? If we accept that as true as we must, because it is a factual allegation, it means quite simply that in spite of the fact that this virus is according to them ubiquitous and is present in all of their restaurants all the time, they are operating the restaurants. And what does that mean? It means they're not unusable. It means they're using them. Let me just try to put a finer point on that. I thought that counsel reiterated earlier in his argument that that's after physical alteration, deep disinfection, et cetera, and that he defines restoration as those processes. Again, your honor, forgive me, but I have to point out that the complaint says nothing about that. The complaint does not say that legal seafoods closed the restaurant, cleaned and then reopened, or that it partially closed, cleaned and reopened. What's critically important here, and this is where the period of restoration definition has to be considered in defining and understanding direct physical loss or direct physical damage. If the court would indulge me, just for a second, that definition period of restoration is built into the coverages that they seek, business income and extra expense. And what it says is that they are entitled for a covered loss to recover business incomes sustained during the period of restoration because of a necessary suspension. The period of restoration begins 24 hours after the date of critical language on the date when the property should be repaired, rebuilt, or replaced with reasonable speed and similar quality. What does that tell us? That language helps to give us a good solid clue about what physicality means in the term physical loss and physical damage. Taking that back to what legal seafoods alleges, there is nothing in this complaint, nothing, that suggests that they ever did anything to repair, rebuild, or replace, or frankly, even clean any property that they claim allegedly was touched by coronavirus at any time. And let's remember, it's really important to remember, this is a property insurance policy. The typical thing it provides for a simple example is the fire that your honor raised earlier. There's a fire in a They fix the repairs or the damage during that time frame. They are out of business, so they submit a claim for business income loss because their operations are suspended by the fire. But they're making repairs to the property. Here, despite the fact that legal seafoods is seeking business income loss, it has never sought, nor does it allege in the complaint, that it was necessary to do anything to address the presence of virus that they allege was in these properties. And that is a critical distinction because it tells us that there is neither a loss that is physical and that there is no damage that could reasonably be described as physical here. So that distinguishes this case. And yes, I understand Mr. Levine argues and explains to some things that clearly are not pled in the complaint. But he's not allowed to supplement a deficient complaint. The complaint does not ask for any form of cost to repair, rebuild, replace, or do anything else to the property. That makes it, in my experience, over 25 years doing this work, the first time I've ever seen a property insurance claim where they didn't seek the cost to fix the property. And that tells you there's no physical loss. What there is, is strictly economic loss. And as the Sixth Circuit recently pointed out a week and a half ago in Santos Italian Cafe, which is a case that we submitted as supplemental authority, in a similar instance where they allege that government orders suspended their operations, insurance is not a safety net for all dangers. And it doesn't cover everything. It's not a guarantee of a business's financial performance. But that's what Legal Seekers views this policy as. They have not plausibly alleged physical loss or physical damage or a suspension caused by that. Yes, Your Honor. One, if you could just address paragraph 66 of the complaint and why that's not significant. Paragraph 66, Your Honor, is what I think Iqbal and Bell Atlantic versus Twombly would call a classic conclusory allegation. That merely says... I see that. But at least that's clear there. They're not saying it's the orders that caused it, right? They're saying it's the presence of the virus that caused it. That's the only way Well, so yes, Your Honor, that paragraph 66 for the record says that SARS-CoV-2 caused the loss of their property by rendering it dangerous, unfit, and unsafe for its intended and ensured use as a restaurant. But as I pointed out, the factual allegations of the complaint, including 62. Yeah. So now just take a case involving odors, right? And an odor that's, you know, renders the restaurant unusable. And let's say that the factual situation is such that attempts to counter the odor with disinfectant would itself be so powerful, be unpleasant to be there. And that essentially the only thing that's really going to solve the problem is time until the odor fades. Is your position in that circumstance that there's no recovery? Your Honor, I think it would depend on some important facts. And I think that there are, you could conceive of situations where there is a chemical or biological agent like, you know, it may cause an odor, a very, very bad odor that could result in the need for substantial removal and replacement of property and render the building unusable for any purpose. It's conceivable that a fact pattern like that, which we don't have here, could be a form of physical loss. There are some cases that suggest that outside of the jurisdiction. I think you just changed my hypothetical slightly. I'm sorry. I want it to be one which there's an odor and the odor is terrible. And if you tried to counter it with cleaning and the only things you could do, air freshener, would also make the restaurant not very pleasant to be in. And so the only thing you really can do is wait for the odor to go away. Can you get recovery under this policy for that circumstance or are you saying you cannot? Your Honor, I think I would say in that circumstance, it would not be recoverable because, again, it's a matter of not having any tie to repair, rebuild or replace. And what we see in the cases where we find orders or other contaminants that are in buildings is a situation where something physical has to be done to restore the building to pre-loss condition. And that's not something that's happening in that hypothetical. I understand Your Honor, time can't be that thing. Well, I don't know that it can. I suppose if I accept that, certainly, Your Honor, if we're using a hypothetical and time allows it to be remedied, if that condition is bad enough that it truly renders the property unusable, I think that a case can be made for physical loss. Isn't that their argument here? It's not. The thing is here present and it renders it unusable and what makes it usable again is time. No, I don't think that's the case, Your Honor. First of all, they don't allege that it's rendered unusable. They do not plead that. They argue it. They have the allegation in 66, which says it renders it dangerous and unfit. But again, paragraph 62 and also paragraph 79 and 80 are factual allegations that say that they use the restaurant in spite of the fact that people infected with COVID-19 are present and have always been have been present there since March of 2020 and are still there today. And if that's the case, if we accept those facts as true, that means their restaurants are not unusable, just as the MBTA stations are not unusable, just as libraries are not unusable, just as a Starbucks coffee shop is not unusable. We have been in this pandemic. People have been using buildings, occupying buildings. When when if you think about it, when we when when people are they come down with symptoms, what are they told to do? Stay home. Does that mean that your home is unusable? No, the home is usable. The restaurants are usable. They're using them, even though they allege that the virus is ubiquitous. And that's critical because, again, their theory of physical loss, which stretches the concept beyond what Massachusetts has has accepted so far. It depends on this notion that the property is unusable and their complaint just doesn't say that. So even if we were to accept that as as as good law in Massachusetts, which it hasn't been established yet, but even if we were to follow that paradigm, it doesn't help them in this case because their complaint specifically alleges that they have been using their restaurants in spite of the allegation in 62 that virus is ubiquitous and it's constantly reintroduced. Let me pause you there, Mr. Varga. Thank you. Additional questions from the court? All right. Thank you, counsel. Thank you, Your Honor. Mr. Levine. Thank you, Your Honor. And this is why I reserve five minutes. A number of points I'd like to make first to Judge Barron's hypothetical regarding odors, rendering the property unusable. This is exactly the melon case that was decided by the New Hampshire Supreme Court in 2015, where cat urine rendered the property so obnoxiously painful to enter into that that constituted direct physical loss under a very similar insurance policy. Other courts have addressed the issue as well. Wasn't there damage to the to the property by the cat urinating on a part of that property that couldn't be cleaned? I believe the the crux of the decision turned on the fact that the odor property consisting of the cat's urination, was it not? But the decision turns on and in fact, says quite clearly that tangible physical alteration is not necessary. It was the odor itself in melon that triggered coverage under the all risk property policy was the result of the damage. Let me turn you to the are better case, which you cited in your brief, are better versus Cambridge Mutual. In that case, it's an odor case, and that's why you cited it, no doubt. In that case, however, there was actual damage in the property, an oil line, a fuel oil line broke, causing an oil leak, which caused damage, but it also caused a smell in the property. Now that again, is a damage to the property and we don't we have to differentiate between the odor is the cause of the of the coverage in the odor as a result of what the coverage cost itself? Not necessarily, your honor. The question comes down to what is coverage being sought for? Is coverage being sought to repair the broken oil line? Or was coverage being sought because of the inability to use the property because of the odor because of the gas fumes in the air? Same thing in the Matzner case. The case was not about the cost to replace the furnace. The case was about the inability to use the property because of the presence of carbon monoxide. Same thing in Bloom South. In that case, there was again damage to the property. It was damage to the chimney in the property that caused the carbon monoxide. It just didn't appear. The carbon monoxide just didn't appear in the property and therefore there was coverage. What happened was there was actual damage to the property which caused the carbon monoxide. This damage to the kitchen causes a fire which is smoke damage to the dining room. So they have to take care of the dining room not because there's smoke on its own but because the smoke came from a clearly covered occurrence. The smoke comes from a covered occurrence in those cases but in the hypothetical you've now a bit. We've now added in an element of the fire damage. That wasn't the case in Mellon. That wasn't the case in Arbiter and that wasn't the case in Bloom South or Matzner. It was only about the odor. Since we're talking about fire, take the First Presbyterian Church against Western Fire. That was gasoline fumes. Nothing affected the structure. There was no leak of gasoline from the church but the gasoline fumes were outside and around the church. The gasoline fumes infiltrated the church and rendered it unusable and the Colorado Supreme Court said that that triggers coverage. In Shakespeare Festival where we were dealing with smoke from wildfires, again no fire at the insured property but fire elsewhere led to smoke, infiltrated the property, rendered it unusable and that was sufficient to trigger coverage. This has been going on for 50 years in intermediate and high courts across the country and it's happened at least three times in Massachusetts, Matzner, Arbiter and Chief Judge Howard's decision in Bloom South where nothing physical was at issue. The only thing at issue was, was there an injurious substance and external force that rendered the property unusable? In each of those cases, the court said yes, that triggers coverage. How am I supposed to read your complaint with respect to when the circumstance that paragraph 66 alleges occurred? So it's more than just paragraph 66, your honor. If we look at paragraph 4 to begin, legal clearly alleges that the presence of SARS-CoV-2, the virus, the COVID-19 pandemic and the orders caused physical loss or damage and then talks about because of these three, these causes, legal seafoods are submitted in its claim. I get when the timing point occurs if we're focused on the order being the cause of the physical loss. I understood paragraph 66 to be saying that SARS is the cause of the physical loss independent of the orders. How am I supposed to read your complaint to figure out when you are saying that occurred? You're obviously not saying it at the moment any droplet is present in the restaurant because as has been pointed out, other of your allegations suggest that that's not in your view, what renders it on an unfit and dangerous. So your honor, these are largely causation. These are entirely causation questions, which are quintessential questions of fact. No, no, no, no, no, no, no. That's not what I was asking. I want to know from your complaint, when you are saying the condition of it being unfit and dangerous occurs. Right now, I can't tell from the complaint. I know that you say there is a presence of SARS on the property and then you say SARS rendered unfit and dangerous. At the same time, you also say people come into the restaurant with it without saying at that moment it's unfit and dangerous. What is the allegation that we would then be trying to prove as to when the circumstances met? So if your honor turns back a few paragraphs starting at paragraph 60, legal alleges and we give examples. I don't believe there's any requirement under Twombly or Iqbal to plead every instance, but we certainly provide enough to paint the clear picture that infected individuals, including employees and guests with the first known case occurred on March 11, 2020. That's paragraph 60. We then give four specific examples in paragraph 61 of individuals who are at the restaurants or in the vicinity and are very clear to say these are just a handful of examples. If I'm reading your complaint correctly, you're not saying a person who has the disease being present in the restaurant. This is from your complaint. You're not alleging in the complaint that that alone renders it unfit and dangerous, are you? So it's the process. You have to have introduction. The infected individual brings the virus to the property. We then explain in paragraph 65, which Mr. Varga pointed to, how the virus once deposited damages the property. We talk about shedding and the process of shedding. This is paragraph 53-55. There has to be a mechanism to get the virus to the property and it's by infected individuals entering the property, shedding the virus into the air onto the surfaces. The virus then damages the property in the manner that we've alleged. You're not saying that the mere fact of shedding is what makes the paragraph 66 allegation plausible. Where in the complaint is there anything that tells me the quantum of presence of the virus that you think in your referring to? I don't think we talk about quantum in the complaint. That's an issue for an expert to opine on. I certainly wouldn't know and I don't believe Judge Gorton would be in a position to make a judgment call on what if I gave any quantum for that matter, whether that's sufficient or insufficient. In fact, courts have for years recognized that lawyers and judges are not doctors or scientists and they shouldn't be making those calls. Judge Posner recognized this and said it was flat out wrong for a district judge to make that type of decision and in fact reversed the district judge in the Rosen-Sibagaygi case. In medical malpractice cases, we often say and in lots of cases, we say that in the absence of any expert evidence, you can't just allege the causation. You've got to have something in the complaint that suggests a basis for it. Why wouldn't that be sensible here to say that because the complaint is just hard to decipher. It says it's present. It says it renders it unfit. It doesn't say the presence is what renders it unfit. I don't know quite what it's alleging. I thought the complaint quite clearly alleges that the presence of the virus in the air alters the content of the air. It changes the content of the air. The virus on surfaces. As soon as one person with a virus comes in the restaurant. The process is that the virus is introduced and reintroduced into the restaurant. Your definition, isn't that true? As soon as one person who is infected comes into your restaurant, it's now uninhabitable, correct? It is damaged and if damaged in a sufficient quantity, it's uninhabitable for its original insured use. It had limited seating for a period of time and it was not closed, correct? That's correct. Why wasn't it uninhabitable then? It was a question of did legal seafoods know it? They didn't know. Did they know it? They had a virus in the general transport back to March of 2020. We knew very, very little about this virus. Virtually nothing. Courts have now recognized that. It would be unfair to impose on any plaintiff a need or a requirement to plead facts that simply had not been determined yet by science, let alone lawyers. We didn't know that at the time. Legal did determine through the use of experts and others that the presence of this virus affected its property in a certain way and it had to take certain steps in order to mitigate the loss. Is this what we've learned? Mr. Varga opened the door I think because he talked about how the complaint has changed and how we had to allege three versions of the complaint. Yes, that's true because this has been a learning process and if we were to factual detail because we've learned a vast amount since the second amended complaint was filed in this case. Connecticut State Judge just recognized this in one of the cases where he said very clearly, we know a lot about viruses but we don't know. Have you cited this opinion? I believe that opinion was submitted as supplemental authority. If it wasn't, and this is the Newcastle Hotel. Counsel, let me just hold you and ask whether the judges have additional questions or issues they would like to pursue at this time. I don't. Thank you. All right, then we're going to have to leave it there and I thank both counsel. Thank you, Your Honor. That concludes argument in this case. Attorney Levine and Attorney Varga, you should disconnect from the hearing at this time.